# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| PATTI L. CAESAR, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| v. | ) | **10-40005-FDS** |
| | ) | |
| ERIC K. SHINSEKI, Secretary of | ) | |
| Veterans Affairs, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action alleging unlawful employment discrimination on the basis of age and gender. Plaintiff Patti L. Caesar was employed as a staff psychologist at the Veterans Administration Medical Center in Bedford, Massachusetts ("VAMC"). She alleges that she was unlawfully terminated from her position because of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) ("Title VII"), and because of her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1) ("ADEA").

Defendant Eric K. Shinseki, Secretary of Veterans Affairs, has moved for summary judgment in his favor. For the reasons described below, the motion will be granted.

## I.    Factual Background

The facts are stated in the light most favorable to the plaintiff unless otherwise noted.

Patti L. Caesar, Ph.D., began working for the VAMC on June 24, 2007, as a part-time staff psychologist. She was 52. (Pl. Dep. at 8-9). Charles Drebing, Ph.D., the Chief of

Psychology at the VAMC, and Lawrence Herz, M.D., a psychiatrist who served as Director of the

Mental Health Clinic and of the Telemental Health Initiative, interviewed her for the position.  (*Id.*

at 13; Drebing Decl., ¶ 2; Herz Decl., ¶ 2).  She was hired by Dr. Drebing; Dr. Herz approved the

hire.  (Pl. Dep. at 13; Herz Decl., ¶ 4, 10).[1]

Dr. Caesar was the first of three people hired to develop and run the Telemental Health

Initiative ("THI") program, through which the VAMC would provide outpatient mental-health

treatment remotely to veterans.  (*Id.* at 21-23; Herz Decl., ¶ 2).  The other members of the team

were a psychiatrist, Dr. Eric Smith, and a licensed social worker, Linda Cone.  (Pl. Dep. at 21-22;

Herz Decl., ¶ 5).

Dr. Smith was hired in August.  He was the administrative leader for the team and was

primarily responsible for psychopharmacology; he also provided some clinical psychotherapy for

veterans and was assigned to conduct an additional 20 hours of research per week.  (Pl. Dep. at

23-24; Drebing Decl., ¶ 5; Herz Decl., ¶ 7).  He was provided an office and three hours of paid

administrative time.  (Pl. Dep. at 21-22, 177; Herz Decl., ¶ 5, 7).[2]  Dr. Caesar and Ms. Cone

primarily conducted psychotherapy sessions for veterans.  (Pl. Dep. at 21-23; Drebing Decl., ¶ 5;

Herz Decl., ¶ 7).  All three worked under Dr. Herz and Dr. Drebing and were expected to work

20 hours per week on the THI program.  (Pl. Dep. at 21-22).  Dr. Caesar understood the team to

be a non-hierarchical, multi-disciplinary team, organized to develop and provide "telemental"

health services.  (*Id.* at 22).

---

[1] At the time, Dr. Caesar was hired, Dr. Drebing was 48 years old and Dr. Herz was 55.  (Drebing Decl., ¶ 31; Herz Decl., ¶ 4, 10).

[2] Dr. Caesar was provided an unfurnished office in November 2007 after requesting one in October.  (Pl. Dep., at 49, 227).  She did not receive any paid administrative time.  (*Id.*).

During the initial stages of her employment, Dr. Caesar spent approximately 10 hours per week developing the THI program.  (*Id.* at 41).  The THI program became operational in February 2008, about eight months after she began work; at that point, she began to see a few veterans for outpatient therapy through the program.  (*Id.* at 21, 36).  She was also assigned to supervise a post-doctoral student.[3]

## A.   The 15-Session Requirement

The primary measure of the productivity of VAMC psychologists who perform outpatient therapy is the number of patient treatment sessions, or clinical "encounters," they perform. (Drebing Decl. ¶ 7; *see also* Pl. Dep., at 42).  Management sets individualized goals for each psychologist depending upon the level of their other responsibilities, such as inpatient therapy, additional research, and administrative tasks.  (*Id.* at ¶ 8).  Dr. Caesar's goal was set at 15 encounters per week.  (*Id.* at ¶ 8; *see also* Pl. Dep., at 63, 154).

Dr. Drebing maintained typed notes, which he referred to as "Reports of Contact," documenting his meetings with various VA employees.  (*See* Drebing Decl. ¶ 22-23, 27, 30).[4]  In one of those reports, Dr. Drebing noted that he met with Dr. Caesar on October 19, 2007, and explained that she was expected to log around 15 face-to-face clinical hours per week, which included individual and group meetings.  (*Id.*, Ex. 1, at 245).  Dr. Caesar does not recall being told of this requirement during the October meeting, but does remember discussing the need to

---

[3] She also performed other collateral tasks associated with seeing patients, such as telephone calls and meetings.  (*Id.* at 43).

[4] Dr. Caesar testified in her deposition that she believes that some of the information contained in Dr. Drebing's notes is not true.  (*See* Pl. Dep., at 110, 139).  There is no evidence, however, that she has personal knowledge that he fabricated any of that information.  The Court will assume for purposes of summary judgment that Dr. Caesar's understanding or memory of the underlying facts in Dr. Drebing's notes differs from what he recorded.

get her caseload up.  (Pl. Dep., at 46-48, 141).

During the October 19 meeting with Dr. Drebing, Dr. Caesar stated that she had lower productivity primarily because of tension between her supervisors, Dr. Herz and Dr. Drebing.  (Pl. Dep., at 38; 43-48; 81-82).  While Dr. Drebing wanted her to get her caseload up, Dr. Herz wanted to keep her available for the THI program.  (*Id.* at 47).  All patient referrals went through Dr. Herz and required his approval; on multiple occasions, he declined to give her referrals in an effort to limit her caseload to short-term therapy clients.  (*Id.* at 43-48; 82).  Dr. Caesar did not believe that anyone was at fault in this situation, but felt that she was caught in the middle and, thus, was not sure what her priorities should be.  (*Id.* at 83-85).[5]  That situation, she testified, prevented her from increasing her caseload.  (*Id.* at 164).

Dr. Caesar testified that she learned in December 2007 that her supervisors expected that she conduct at least 15 patient-therapy sessions per week.  (*Id.* at 41-42, 63-69, 155).  Dr. Drebing raised the issue of the 15-session requirement, at most, on two other occasions, but she never understood the requirement to be a deal-breaker that would lead to termination.  (*Id.* at 70-71, 139).

During her employment, Dr. Caesar averaged 7.3 encounters per week.  (Def.'s Resp. to Pl. Interrog. No. 12).  Between February 2008 and her termination on June 20, 2008, she averaged 10.6 encounters per week.  (*Id.*; *see also* Pl. Dep., at 305-08).

---

[5] In an e-mail dated February 28, 2008, responding to a referral, Dr. Caesar said that she would probably decline the referral if the veteran needed help right away because she was "pretty full," and her first priority at the moment was to the THI program.  She also stated she would have to discuss the matter with Dr. Herz.  (Wichers Decl., Ex. C).

B.      **Evidence of Alleged Discrimination**

1.      **Treatment of Women at the VAMC**

During her employment at the VAMC, Dr. Caesar regularly had to work weekends to complete her paperwork and other administrative assignments. (*Id.* at 65). When doing so, she often saw other women working in the office as well. (*Id.*). She testified that this was normal and reflected a culture of women working harder than men at the VAMC. (*Id.*).

At one point, when she was not particularly busy, Dr. Herz and Dr. Drebing asked Dr. Caesar to assist Douglas Bitman, Ph.D., in his capacity as the Suicide Prevention Coordinator. (*Id.* at 191-92). Dr. Bitman asked her to fold pamphlets and helped him organize his desk. (*Id.*). She found this very insulting, as she thought she would be helping him in a more professional capacity. (*Id.* at 192).

Dr. Caesar also testified that she had a conversation with Dr. Drebing where he told her that Dr. Dolly Sadow "thinks she is a family therapist, but she's not." (*Id.* at 188-89). She stated that she felt that Dr. Drebing said this as a way of complimenting her abilities but that it kept her and Dr. Sadow apart. (*Id.*). She also testified about a conversation where Dr. Herz told her that he did not like a VA employee named Donna Cabral. (*Id.* at 184-85). She interpreted this comment to mean that Dr. Herz did not like Ms. Cabral because he did not like working with women in power. (*Id.*).

2.      **The Student Training Program**

Dr. Caesar also participated in a training program in which psychologists were assigned to supervise at least one post-doctoral student or doctoral intern. (*Id.* at 277-78; Drebing Decl. ¶ 10). Richard Amodio, Ph.D., supervised the training program. (Pl. Dep., at 130; Amodio Decl. ¶

1).  Dr. Caesar was assigned to supervise one intern; Tu Ngo, Ph.D., was also assigned to supervise the same person.  (Pl. Dep., at 254).  David Kalman, Ph.D., was the intern's preceptor.  (*Id.* at 250).

Over time, Dr. Ngo and Dr. Kalman perceived that the intern was experiencing significant performance problems; Dr. Caesar, however, disagreed.  (Drebing Decl., ¶ 23; *see also* Wichers Decl., Ex. D).  As a result, tension developed between the three, and they became increasingly polarized.  Dr. Caesar expressed that concern to Dr. Amodio.  (Pl. Dep., at 130; Drebing Decl., ¶ 23).  She also expressed the view to Dr. Bitman that Dr. Kalman's treatment of the intern amounted to a "witch hunt."  (Pl. Dep., at 120, 122-24; Wichers Decl., Ex. D; *see also* Drebing Decl., Ex. A, at 235).

As tensions rose, Dr. Amodio and Dr. Ngo expressed their concerns about Dr. Caesar's behavior to Dr. Drebing.  (Drebing Decl., Ex. A, at 236, 239, 241).  Specifically, Dr. Amodio expressed frustration as to Dr. Caesar's failure to see the intern's performance problems and the manner in which she communicated her disagreement on that issue.  (*Id.* at 239, 241; Amodio Decl., ¶ 2).  Dr. Amodio requested that Dr. Caesar not be involved in the student training program the following year.  (Drebing Decl. Ex. A, 239, 241; Amodio Decl., ¶ 2).  Dr. Ngo told Dr. Drebing that Dr. Caesar had stated that she had no respect for Dr. Kalman, and used "very strong language" when speaking about the situation regarding the intern.  (Drebing Decl. Ex. A, at 236; Ngo Decl., ¶ 2).  Dr. Ngo expressed concern that there was a split among the intern's supervisors, and noted that Dr. Caesar had not attended either the meetings of the supervisors when discussing this issue or the meetings of the psychology training committee.  (Drebing Decl. Ex. A, at 236; Ngo Decl., ¶ 2).

6

Dr. Caesar testified that she wanted to attend the training committee meeting, as she felt disconnected from her colleagues, but that she could not attend because Dr. Drebing would not give her workload credit for the meetings.  Instead, she met with a patient when the meetings were scheduled.  (Pl. Dep., at 156-57).  As a result, she was the only supervisor who did not attend the meetings.  (*Id.*).

Dr. Drebing spoke with two other psychologists, Edward Federman, Ph.D., and Dr. Bitman, about Dr. Caesar's participation in the training program.  (Drebing Decl., Ex. A, at 235, 240).  Dr. Federman stated that he agreed with the intern's other supervisors and that Dr. Caesar's view was an outlier opinion.  (*Id.*, at 240).  Dr. Bitman reported his conversation with Dr. Caesar, and expressed concern about the "strong language" she used to describe the situation and Dr. Kalman.  (*Id.*, at 235).[6]

During February and March 2008, Dr. Caesar spoke with Dr. Drebing on at least two occasions about her concerns about the treatment of the intern, and the fact that she felt Dr. Smith was overly controlling.  (Pl. Dep., at 22, 118-19, 124-25, 227; Drebing Decl., Ex. A, at 237, Ex. B).  Dr. Caesar testified that she was frustrated that Dr. Smith treated her like a member of his "staff," rather than as an equal colleague.  (*See* Pl. Dep., at 22, 227).  Dr. Drebing told her that her colleagues were concerned about her attitude about the intern's performance problems and her use of inflammatory language.  (*Id.* at 118-19, 124-25; Drebing Decl., Ex. B).  Dr. Caesar acknowledged that she had told Dr. Kalman that the situation with the intern felt like a witch hunt, and wanted to try to repair her relationship with the team.  (Pl. Dep., at 124).

---

[6] Dr. Bitman reported that Dr. Caesar referred to the situation as a "lynching."  However, undisputed evidence in the record indicates that she referred to the situation as a "witch hunt."  (*See* Pl. Dep., at 120, 122-24)

### C.   <u>Termination</u>

On June 5, 2008, Dr. Drebing submitted a memorandum to the human resources department summarizing his concerns about Dr. Caesar and requesting permission to terminate her employment.  (Drebing Decl., ¶ 27 & Ex. A-B).  Dr. Drebing stated that she had failed to conduct at least 15 sessions per week, and outlined various complaints he had received from her colleagues. He also attached his Reports of Contact.  (*Id.*).  Dr. Drebing then met with her on June 10 and explained that her employment was going to be terminated.  (Pl. Dep., at 164-65).  He gave her a letter to that effect, along with a copy of the memorandum he submitted to human resources, and copies of his Reports of Contact.  (Pl. Dep., at 165, 284).

Dr. Caesar was 53 when she was terminated.  (Pl. Dep., at 8-9).  Her position was vacant for four months, after which it was combined with another half-time position and filled by a 30-year-old female psychiatrist.  (Def.'s Resp. to Pl. Interrog. No 13).

## II.   <u>Administrative History</u>

On July 21, 2008, Dr. Caesar filed an administrative complaint alleging that she had been terminated because of her age and gender.  (Pl. Dep., at 169).  An Equal Employment Opportunity Investigator reviewed her complaint and heard sworn testimony from Dr. Cone.  (Wichers Decl., Ex. F, at 147).  On March 31, 2009, the VA issued a final agency decision denying Dr. Caesar's claim.  (Pl. Dep., at 169-70).  She appealed that decision to the United States Equal Opportunity Commission's Office of Federal Operations, which affirmed.  (*Id.* at 180-81).  On January 6, 2010, she initiated this action.

III.   **Standard of Review**

Summary judgment may be entered if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The evidence must be viewed in the light most favorable to the non-moving party.  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991).  Nonetheless, summary judgment may be entered even "where elusive concepts such as motive or intent are at issue," if the non-moving party rests only upon "conclusory allegations, improbable inferences, and unsupported speculation."  *Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 871 (1st Cir. 1997) (quotation omitted).  For "summary judgment [to retain] its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways," the Court must focus on the genuine disputes of material facts.  *Mesnick*, 950 F.2d at 822.  "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Morrissey v. Boston Five Cents Sav. Bank*, 54 F.3d 27, 31 (1st Cir. 1995).

IV.   **Analysis**

To establish a *prima facie* case for gender-based discriminatory discharge under Title VII, a plaintiff must show that (1) she was a member of a protected class; (2) she possessed the necessary qualifications and adequately performed her job; (3) she was nevertheless dismissed; and (4) the employer sought someone of roughly equivalent qualifications to perform substantially the same work.  *Gomez-Gonzalez v. Rural Opportunities, Inc.*, 626 F.3d 654, 662 (1st Cir. 2010) (quoting *Rodriguez–Torres v. Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 58 (1st Cir. 2005)).  Similarly, to establish a *prima facie* case for age-based termination under ADEA, a plaintiff must show that (1) she was at least 40 years old; (2) she was qualified for the position she had held; (3)

she was fired; and (4) the employer subsequently filled the position, demonstrating a continuing

need for the plaintiff's services.  *Id.* (quoting *Vélez v. Thermo King de P. R., Inc.*, 585 F.3d 441,

447 (1st Cir. 2009)).

Where no direct evidence of discriminatory animus and causation exists, the Court should

evaluate the claim using a three-stage burden-shifting method of proof.  *Rodriguez–Torres*, 399

F.3d at 58; *Melendez v. Autogermana, Inc.*, 622 F.3d 46, 50 (1st Cir. 2010); *see McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  In the first stage, the plaintiff must establish a

*prima facie* case by a preponderance of the evidence.  This initial showing is "not especially

burdensome, and once established, gives rise to a rebuttable presumption that the employer

engaged in intentional . . . discrimination."  *Melendez*, 622 F.3d at 50 (quoting *Woodman v.*

*Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir. 1995)).

The employer may rebut the presumption of discrimination by articulating a legitimate,

non-discriminatory reason for the termination and producing some credible evidence to support

that reason.  *Id.* at 50; *Gomez-Gonzalez*, 626 F.3d at 662.  If the employer does so, the plaintiff

"must then show, by a preponderance of the evidence, that the employer's articulated reason for

the adverse employment action is pretextual and that the true reason for the adverse action is

discriminatory."  *Gomez-Gonzalez*, 626 F.3d at 662 (quoting  *Lockridge v. Univ. of Me. Sys.*, 597

F.3d 464, 470 (1st Cir. 2010)).

Here, the parties agree that plaintiff has made out a *prima facie* case under Title VII and

ADEA.  They also agree that defendant has articulated a non-discriminatory reason for plaintiff's

termination—namely, that she failed to meet her required productivity standards and that plaintiff's

colleagues complained about her—and has produced evidence to support that reason.  Thus, the

only issue for the Court to determine is "whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus."  *Gomez-Gonzalez*, 626 F.3d at 662 (quoting *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir. 1996)).

## A.   <u>Pretext</u>

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Id.* at 662-63 (quoting *Morgan v. Hilti*, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)).

Plaintiff advances three basic contentions to show pretext.  First, she argues that she was treated differently than Dr. Smith, a similarly situated younger male employee.  Second, she contends that the complaints made against her were false and must be evaluated by a trier of fact. Finally, she alleges that the 15-session requirement was pretextual because of the conflicting expectations of her supervisors and a culture of discrimination at the VAMC that required women to work harder than men.

### 1.   <u>Disparate Treatment</u>

"One method [of showing pretext] is to produce evidence that the plaintiff was treated differently than other similarly situated employees."  *Ugurhan Akturk Kosereis v. Rhode Island*, 331 F.3d 207, 214 (1st Cir. 2003).  Plaintiff contends that the disparate treatment of men and women at the VAMC—specifically, the difference in how she and Dr. Smith were treated—demonstrate that defendant's actions were improperly motivated by discrimination.

"A claim of disparate treatment based on comparative evidence must rest on proof that the

proposed analogue is similarly situated in material respects." *Walker v. City of Holyoke*, 523 F.

Supp. 2d 86, 103 (D. Mass. 2007) (quoting *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747,

751 (1st Cir. 1996)).  "The test is whether a 'prudent person, looking objectively at the incidents,

would think them roughly equivalent and the protagonists similarly situated.'" *Id.* (quoting

*Perkins*, 78 F.3d at 751).  Thus, plaintiff must show that similarly situated younger or male

employees were treated more favorably, and that she was treated differently because of her age or

gender. *See Rivas Rosado v. Radio Shack, Inc.*, 312 F.3d 532, 534 (1st Cir. 2002).

      Plaintiff contends that Dr. Smith, a younger male, was similarly situated and, unlike her,

immediately received a furnished office and paid administrative time.  The parties do not contest

that Dr. Smith received an office before plaintiff did and that he was paid administrative time.

However, she has not shown that she and Dr. Smith were similarly situated.  While plaintiff's and

Dr. Smith's situations bear superficial similarities—they were hired at approximately the same

time, and required to spend 20 hours a week developing and running the THI program—Dr. Smith

had additional responsibilities that were directly relevant to the disparate treatment.  Most

significantly, unlike her, Dr. Smith was a full-time employee.  In addition to sending 20 hours per

week on the THI program, he worked 20 hours per week conducting research and preparing a

New Investigator Research Award application.  Dr. Smith also had additional responsibilities as a

member of the THI team.  As the only M.D. on the team, he provided psychopharmacology as well

as clinical psychotherapy for veterans.  (Pl. Dep. at 23-24; Drebing Decl., ¶ 5; Herz Decl., ¶ 7).

Furthermore, Dr. Smith was the administrative leader of the THI team, which involved additional

responsibilities that were not shared by plaintiff or Ms. Cone.[7]  Taken together, these

differentiating circumstances clearly distinguish defendant's treatment of plaintiff and Dr. Smith.

*See Perkins*, 78 F.3d at 751.  For these reasons, Dr. Smith and plaintiff were not similarly situated,

and the differential treatment afforded to him is not evidence sufficient to defeat summary

judgment.

> ### B.     <u>Employee Complaints</u>

Plaintiff next contends that there is a genuine issue of material fact as to the credibility of

the complaints about her work in connection with supervising the intern.  Specifically, she

contends that "because the Defendant is using these complaints to justify the Plaintiff's termination

and she denies that these complaints are true, the judge or jury is needed to determine whether this

reason was a pretext for discrimination."  (Pl. Opp. Mem., at 2).

Plaintiff's argument is misplaced.  In assessing pretext, this Court must focus on "'the

perception of the decisionmaker,' that is, whether the employer believed its stated reason to be

credible."  *Mesnick*, 950 F.2d at 824.  Thus, the ultimate question for the factfinder to determine is

not whether the complaints made against plaintiff were *true*.  Rather, the question is whether the

decisionmakers *knew* the complaints were false, and what *effect* those complaints had on the

decision to terminate her employment.  Plaintiff has not offered any evidence that Drs. Drebing or

Herz knew or doubted, or had any reason to doubt, the legitimacy of the complaints.  Instead, she

simply testified that the underlying complaints were false and that Dr. Drebing fabricated or

---

[7] Plaintiff testified that she understood the team to be "nonhierarchical" and expressed frustration to Dr. Herz that Dr. Smith treated her like a member of his "staff."  (*See* Pl. Dep., at 22, 227).  However, she has not directly challenged the contention that Dr. Smith was the administrative leader of the THI team, nor has she presented any contrary evidence.  *See Pilgrim*, 118 F.3d at 871; *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 479 (1st Cir.1993).

distorted the nature of the complaints.

Furthermore, plaintiff's testimony has evidentiary force only to the extent that it is based on her personal knowledge of the subject about which she is testifying.  Fed. R. Ev. 602; *see also* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 479 (1st Cir.1993) ("the material creating the factual dispute must herald the existence of 'definite, competent evidence' fortifying the plaintiff's version of the truth.").  Plaintiff has *not* testified that she had personal knowledge that Dr. Drebing fabricated the complaints, nor has she presented any other evidence to that effect.  *See* Fed. R. Ev. 602 ("Evidence to prove personal knowledge may consist of the witness's own testimony.").  Thus, plaintiff's assertion that Dr. Drebing fabricated or distorted the complaints is not enough.  She cannot create an issue of material fact as to his intent and motivation (or those of Dr. Herz) by resting on "conclusory allegations, improbable inferences, and unsupported speculation."  *Pilgrim*, 118 F.3d at 871; *see also Macone v. Town of Wakefield*, 277 F.3d 1, 5 (1st Cir. 2002) ("Appellants are entitled to all inferences which are fairly supported by the evidence, but are not permitted to build their case on mere opprobrious epithets of malice . . . or the gossamer threads of whimsey, speculation and conjecture." (internal citation and quotation marks omitted)).

Accordingly, plaintiff's assertion that the complaints made against her were false, without more, is insufficient to create an issue of fact to survive summary judgment.

## C.    The 15-Session Requirement

Plaintiff's final argument is that the 15-session requirement was pretextual because

14

defendant effectively prevented her from completing that requirement.  In substance, plaintiff contends that there was tension between Dr. Herz and Dr. Drebing as to her job priorities, and that Dr. Herz prevented her from obtaining the referrals she needed to meet the 15-session requirement.[8]

Construing the evidence most favorably to plaintiff, a factfinder could reasonably infer that Dr. Herz wanted her to prioritize the THI program, which caused her to miss some referral opportunities.  For example, on February 28, 2008, after she had been informed in December she needed to get her therapy session numbers up to 15 per week, she responded to an e-mail referral that she would "need to run this by Larry Herz" because her first priority was to the THI program. (Wichers Decl., Ex. C).  But the fact that the Dr. Herz and Dr. Drebing communicated different priorities is not sufficient evidence to show that they prevented her from meeting the 15-session requirement.  *See Gomez-Gonzalez*, 626 F.3d at 662-63.

More importantly, there is simply no evidence in the record that would allow a reasonable factfinder to conclude that the tension between Dr. Herz and Dr. Drebing was in any way related to plaintiff's gender or age.  In her deposition, plaintiff initially testified that the tension between Dr. Herz and Dr. Drebing was "probably not" related to her gender and age, but she later testified that she thought that her being put in the crossfire between the two was "demeaning" and "related to [her] sex and gender."  (Pl. Dep., at 164, 260).  Even if, for purposes of summary judgment, the Court assumes that plaintiff actually believed the situation was related to her gender, her subjective

---

[8] Plaintiff also contends that Dr. Drebing did not make the 15-session requirement clear.  That contention is inconsistent with her assertion that she knew about and expressed her frustration with the her supervisor's conflicting expectation.  Furthermore, she testified that Dr. Drebing explicitly told her about the 15-session requirement two or three times, and over time more persistently told her she had to increase the number of therapy sessions she conducted.  Thus, she was at least aware that her performance did not meet Dr. Drebing's expectations.  *See Bermudez-Rosa v. Kelly Services, Inc.*, 2011 WL 4537895, at *12 (D. P.R. Sept. 30, 2011).

perception is not evidence from which pretext may be inferred. *Pilgrim*, 118 F.3d at 871. And she

has not presented any evidence beyond her subjective perception that Drs. Herz or Drebing were

motivated by reasons of gender or age discrimination.[9]

Of course, this Court may not look at plaintiff's evidence of discrimination in isolation.

*Mesnick*, 950 F.2d at 824. She also contends that a general culture of discrimination at the VAMC

demonstrates pretext. She argues that defendant denies women opportunities and sets higher

standards for women, then fires women for not meeting those standards.

General allegations of a discriminatory culture have less probative weight when, as here,

plaintiff is alleging disparate treatment. *Adamson v. Wyeth Pharmaceuticals*, 2005 WL 2323188,

at \*17 (D. Mass. Aug. 23, 2005); *see also LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848 (1st

Cir. 1993). This is because "[i]n a disparate treatment case . . . the issue is less whether a pattern

of discrimination existed and more how a particular individual was treated, and why." *Cumpiano*

*v. Banco Santander Puerto Rico*, 902 F.2d 148, 156 (1st Cir. 1990). This does not mean that such

evidence is irrelevant to the question of pretext. *See Mesnick*, 950 F.2d at 824 (stating that

---

[9] As evidence of discriminatory motivation, plaintiff points to a comment Dr. Drebing made about Dr. Dolly Sadow that "she thinks she is a family therapist, but she's not," and a comment by Dr. Herz saying he did not like a female employee named Donna Cabral. (Pl. Dep., at 184, 189). At most, these isolated comments are "'stray workplace remarks' [that] normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus." *Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 69 (1st Cir. 2002); *accord Williams v. Raytheon Co.*, 220 F.3d 16, 18 (1st Cir. 2000). Moreover, in context, these comments do not support a reasonable inference of discriminatory motive. Plaintiff testified that Dr. Drebing's comment about Dr. Sadow was made in the context of complimenting her own abilities as a therapist, and that Dr. Herz simply said he did not like Ms. Cabral without indicating why. (Pl. Dep., at 184, 189). While plaintiff testified that she believed Dr. Herz did not like Ms. Cabral because he did not like working with women in power, that was "just her assessment," and she offered no other evidence or context to support that assessment. (*Id.* at 184-85). *See Speen v. Crown Clothing Corp.*, 102 F.3d 625, 636 (1st Cir. 1996) ("[I]solated or ambiguous remarks, tending to suggest animus based on age, are insufficient, standing alone, to prove an employer's discriminatory intent." (internal citation and quotation marks omitted)).

"statistical evidence showing disparate treatment by the employer to members of the protected class" is relevant to pretext).  However, it must be evaluated in light of plaintiff's "aggregate package of proof" to determine whether the decisionmaker "believed its stated reason to be credible." *Mesnick*, 950 F.2d at 824.

Here, plaintiff's evidence consists of her deposition testimony describing her experience, observations, and impressions while working at the VAMC.  Specifically, she testified that she believed that women were overworked compared to men.  She testified that she regularly had to work weekends to complete her assignments and that during those weekends, she saw other women working.  She also testified that Dr. Herz and Dr. Drebing asked her to assist Dr. Bitman, and that Dr. Bitman asked her to help fold pamphlets and organize his desk rather than do more substantive work.  (Pl. Dep., at 191-92).  And she contends she could not attend the training committee meetings because Dr. Drebing would not give her workload credit for the meetings. (*Id.* at 156).  Plaintiff appears to argue that this is evidence of disparate treatment because unidentified male employees did not have these types of issues or obstacles.[10]  However she does not offer any evidence that the relevant male and female employees were similarly situated.

Plaintiff also contends that the 15-session requirement was pretextual because it was

---

[10] Plaintiff also testified about conversations she had with other female employees who stated they did not receive an office right away, and with another female employee who felt that Dr. Drebing had discriminated against her.  (Pl. Dep., at 246, 260-61).  While plaintiff testified that some of these women may be called as witnesses, she has not presented any depositions, affidavits, declarations, or other admissible material to support these claims.  Thus, this testimony is hearsay and is not admissible to defeat summary judgment unless plaintiff can establish that the statements fall outside the definition of hearsay or fit within an exception to the rule.  *See* Fed. R. Civ. P. 56(c)(2).  "As the proponent of the evidence, plaintiff has the burden of demonstrating that the statements fit within the confines of Rule 801 and are thus admissible."  *DiMare v. RealtyTrac, Inc.*, 714 F. Supp. 2d 199, 206 (D. Mass. 2010) (citing *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1440 (9th Cir. 1990)). Plaintiff has not attempted to meet this burden, and, based on her deposition testimony, the statements do not appear to fit into any of the hearsay exclusions or exceptions.

unduly burdensome. That, however, does not establish discriminatory animus. In an employment discrimination case, the Court may not assess the merits or rationality of an employer's non-discriminatory business decisions. *See Melendez*, 622 F.3d at 53 (citing *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991)). Neither Title VII nor the ADEA prevent defendant from discharging plaintiff for any reason, fair or unfair, as long as it was not because of her gender or age. *See id.* Thus, plaintiff's "general averment that the [work requirement] was 'unreal,' is insufficient to allow a reasonable fact-finder to conclude that [it] was adopted and employed to mask [defendant's] discriminatory animus." *Id.* Furthermore, plaintiff testified that had she clearly understood her priorities she could have met the 15-session requirement, and defendants have produced evidence that five full-time psychologists averaged 46.8 clinical encounters each per week—more than three times plaintiff's required goal. (Pl. Dep., at 82, 164; Drebing Decl., ¶ 17).

In any event, the ultimate question is not whether plaintiff was treated fairly, but whether the decisionmakers—in this case, Dr. Herz and Dr. Drebing—acted with discriminatory animus. *Melendez*, 622 F.3d at 53-54. Although plaintiff testified as to tasks given to her by Dr. Bitman and her subjective perception of the corporate culture, she has not presented any evidence (beyond her perception and speculation) that Dr. Herz and Dr. Drebing were motivated by discriminatory animus. *See Pilgrim*, 118 F.3d at 871.

Defendant has presented substantial uncontested evidence rebutting an inference of discriminatory animus. It has presented evidence that plaintiff was told about the 15-session requirement and did not meet it, and that Dr. Drebing received multiple complaints from her colleagues. Defendant also points out that plaintiff was hired and fired by the same decisionmaker—Dr. Drebing—within a year. "In cases where the hirer and the firer are the same

18

individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 847 (1st Cir. 1993) (quoting *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991)).[11]

Finally, although not dispositive in itself, the inference of age discrimination is further weakened by the fact that plaintiff was within the protected class under the ADEA when she was hired and the managers who made the firing decision were within or close to ADEA age when they decided to fire plaintiff. *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 847 (1st Cir. 1993) (noting that defendant "was nearly sixty years old when he decided to terminate [plaintiff]"); *Richter v. Hook-SupeRx*, 142 F.3d 1024, 1032 (7th Cir. 1998); *Mathews v. Atria Huntington*, 499 F. Supp. 2d 258, 267 (E.D.N.Y. 2007)).[12]

---

[11] Defendant has also presented statistical evidence of Dr. Drebing's hiring and discipline record. Although statistical evidence of a company's general hiring patterns carry less weight in a disparate impact case, statistical evidence of the decisonmaker's track record in hiring and disciplining women more directly bears on his specific intentions and can be relevant to negate an inference of discriminatory motive. *See LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848 (1st Cir. 1993); *Joshi v. Florida State University*, 646 F.2d 981, 990 n.32 (5th Cir. 1981).

Dr. Drebing has been involved in the hiring of 51 employees, 63% of whom were women. of the psychologists Dr. Drebing hired, 73% were women. Dr. Drebing has requested the termination of only two employees, one man and one woman (the plaintiff). He has suspended one employee—a man—and has placed written counseling memoranda or notes in the files of three women and three men. In light of the potential weaknesses of statistical evidence—it is possible, for example, that vastly more women applied for the positions for which Dr. Drebing was hiring—and the fact that this evidence is not directly connected to plaintiff's case, this evidence alone does not conclusively prove a lack of discriminatory animus. *See LeBlanc*, 6 F.3d at 848. However, unlike most statistical evidence in discrimination cases, this evidence directly reflects the practices of the decisionmaker with regard to his professional treatment of women and is relevant to negate an inference of discriminatory motive. *See Id.*; *Joshi*, 646 F.2d at 990 n.32.

[12] Both parties contend that plaintiff's replacement (a younger woman) supports their case. Defendant contends that hiring a woman rebuts a finding of gender discrimination, while plaintiff contends hiring a younger replacement demonstrates age discrimination. Although "the attributes of a successor employee may have evidentiary force in a particular case," plaintiff is certainly not required to prove "that her job was filled by a person not possessing the protected attribute." *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 155 (1st Cir. 1990). In light of the weight of the other evidence in this case, any evidentiary force of the attributes of the

"An employer [is] entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employee's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000).  Here, plaintiff has, at best, created a weak issue of fact as to pretext.  Considering "plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and other evidence supporting the employer's case," defendant is clearly entitled to summary judgment.  *Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 47-48 (1st Cir. 2002).

## V.      Conclusion

For the forgoing reasons, defendant's motion for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  January 25, 2012

successor employee does not effect the outcome of this case.